Field 7/23/14  P. v. Hernandez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048021 |
| v. | (Super. Ct. No. 10HF1594) |
| CHRISTOPHER HERNANDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, J. Michael Beecher, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed and remanded for resentencing.

Erica Gambale for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

INTRODUCTION

Defendant Christopher Hernandez appeals from the judgment of conviction entered after a jury found him guilty of willfully harming a child and willfully inflicting cruel or inhuman corporal punishment on a child. The jury also found true, as to both offenses, the enhancement allegation that Hernandez inflicted great bodily injury to a child while committing or attempting to commit a felony. Hernandez contends the trial court erred by allowing expert witness testimony about shaken baby syndrome and injuries typically suffered by children in high-speed collisions. He argues the expert witnesses lacked sufficient qualifications to offer expert opinions on those subjects and the court should have sustained his objections to that testimony. Hernandez also contends the trial court abused its discretion by imposing the upper term sentence of six years for the conviction of willfully harming a child.

We affirm and remand for resentencing. For the reasons we will explain in detail *post*, the prosecution's expert witnesses, who were all physicians and had treated Hernandez's victim, were amply qualified to offer the expert opinions they gave at trial. We therefore affirm the judgment. Because the trial court failed to state reasons for imposing the upper term sentence, we remand for resentencing.

FACTS

In 2010, Hernandez lived with his girlfriend, C.F, and C.F's 13-month-old daughter, D. On September 2, 2010, C.F. took a shower, leaving D. alone with Hernandez. Minutes later, Hernandez entered the bathroom and told C.F. that D. was not breathing correctly.

At C.F.'s direction, Hernandez called 911, and the paramedics took D. to the emergency room. Hernandez told C.F. he had dropped D., tried to splash water on her face, and spanked her to try to awaken her. Hernandez told Orange County Sheriff's

2

Detective Mike Starnes that D. fell and hit her head; Hernandez stated he had dropped D., and denied shaking her.

During D.'s 20-day stay in the hospital, four physicians were involved in her care. Dr. Kenneth Kwon, a pediatric emergency room physician, performed an endotracheal intubation because D. was having difficulty breathing. Dr. Kwon also ordered a CAT scan for D.; she was thereafter admitted to the pediatric intensive care unit. Dr. Kwon testified D.'s injuries were due to "non-accidental trauma" and were similar to "acceleration or deceleration" injuries.

Dr. Todd Lempert, a radiologist, reviewed D.'s MRI and CAT scan results. He determined D. suffered from an interhemispheric subdural hematoma and a frontal subdural hematoma. Dr. Lempert testified D.'s injuries were a "classic kind of thing for child abuse" and consistent with shaken baby syndrome.

Dr. Ramin Tayani, an ophthalmologist, examined D.'s eyes. He determined D. had hemorrhages in both eyes. Dr. Tayani testified he had noted "the diagnos[is] of shaken baby syndrome should be considered highly."

Dr. Gary Goodman, a pediatric intensive care physician, took care of D. while she was in the pediatric intensive care unit. Dr. Goodman saw bruises on D.'s back, buttocks, left ear, and thigh. He testified infants "can be injured by having them being shaken very hard" and "subdural hematomas and retinal hemorrhages" are common injuries from being shaken. Dr. Goodman also testified D.'s injuries were similar to rotational force injuries.[1]

Dr. Janice Ophoven, a pediatric forensic pathologist and pediatric pathologist, testified as an expert for Hernandez. She testified D.'s injuries were from

---

[1] Hernandez's reply brief states he "raised no objections to Dr. Goodman's opinions during the trial . . . because Dr. Goodman did provide the necessary training, experience, and education to render such an opinion." We therefore do not further address Dr. Goodman's testimony.

3

blunt force trauma to her head with resulting complications. Dr. Ophoven also testified D.'s injuries could not have occurred from being shaken without impact.

PROCEDURAL BACKGROUND

Hernandez was charged in an information with one count of willfully harming a child in violation of Penal Code section 273a, subdivision (a) (count 1), and one count of willfully inflicting cruel or inhuman corporal punishment on a child in violation of Penal Code section 273d, subdivision (a) (count 2). The information also alleged, as to counts 1 and 2, that Hernandez inflicted great bodily injury to a child while committing or attempting to commit a felony, within the meaning of Penal Code section 12022.7, subdivision (d).

The jury found Hernandez guilty of counts 1 and 2, and it found true the enhancement allegation as to both counts. Hernandez filed a motion for a new trial on the ground Dr. Lempert and Dr. Tayani were unqualified to testify about shaken baby syndrome. The trial court denied Hernandez's motion.

The trial court sentenced Hernandez to a total prison term of 12 years by imposing the upper term of six years on count 1 and a consecutive six-year term for the attendant enhancement. Pursuant to Penal Code section 654, the court stayed execution of sentence as to count 2 and the attendant enhancement. Hernandez appealed.

DISCUSSION

I.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING THE PROSECUTION'S EXPERT WITNESSES' TESTIMONY.

Hernandez contends the trial court erred by allowing Dr. Tayani and Dr. Lempert to testify about shaken baby syndrome because they were not qualified to offer expert opinions on that subject. For the reasons we explain *post*, Dr. Tayani and

4

Dr. Lempert were more than qualified to offer the expert opinions they gave at trial. Although Hernandez's appellate briefs suggest Dr. Kwon was unqualified to testify about shaken baby syndrome, his testimony did not include that subject. He did testify D.'s injuries were "non-accidental," and as discussed *post*, he was well qualified to offer that testimony. Hernandez argues the trial court erred by allowing Dr. Kwon to testify D.'s injuries were similar to high-speed collision injuries; Hernandez's challenge as to that testimony is also without merit.

A.

*Evidence Code section 720, subdivision (a) and*<br>*the applicable standard of review*

Evidence Code section 720, subdivision (a) provides that an expert is qualified if the expert has "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." The California Supreme Court has stated, "the determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth." (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.) "When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony." (*People v. Jones* (2013) 57 Cal.4th 899, 949-950.)

Courts have considered a variety of factors in evaluating the qualification of a medical expert to testify on a subject, including whether the expert has (1) a degree from an educational institution or is published in the field (*People v. Jones*, *supra*, 57 Cal.4th at p. 950); (2) studied medical literature on the subject, completed specialized training on the subject, or practiced in the field for a substantial period of time (*People v. Catlin* (2001) 26 Cal.4th 81, 132, 133); (3) taught in the field (*Salasguevara v. Wyeth*

5

*Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 386); (4) belonged to professional organizations in the field (*People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1296); (5) treated patients suffering from similar injuries (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1250 [upholding a physician's statement that a child's injuries were similar to angular acceleration injuries because she had seen such injuries in other patients]); and (6) encountered the subject with some frequency (*Mann v. Cracchiolo*, *supra*, 38 Cal.3d at p. 38).

We review the trial court's admission of expert testimony for abuse of discretion. (*People v. Jones*, *supra*, 57 Cal.4th at p. 949.)


B.

*Dr. Tayani was qualified to testify "the diagnos[is] of shaken*
*baby syndrome should be considered highly."*

Dr. Tayani testified as follows about his qualifications as an expert at trial. Dr. Tayani earned a medical degree from the University of California, Irvine, and completed a residency program in ophthalmology. He has been practicing ophthalmology since 1999. He founded an ophthalmology practice that now has seven locations, and he is on staff at multiple hospitals, including the University of California, Irvine Medical Center. Dr. Tayani has also read textbooks about causes of eye hemorrhages.

Dr. Tayani testified that although there are 30 to 50 causes of eye hemorrhages, the list of possible causes "gets smaller" in the case of a 13-month-old child who does not have diabetes or leukemia; shaken baby syndrome is on that smaller list. Dr. Tayani further testified as follows:

"[The prosecutor:] Q. All right. And did you document the amount of hemorrhage, if you can—

6

"A. I don't recall that either. I do remember there [were] hemorrhages in both eyes.

"Q. All right. And you've mentioned the list and differential diagnosis meaning you could have five different medical reasons or five different reasons that particular condition would cause the hemorrhage, but as you go through and eliminate things, either other types of tests or other things that other doctors have done that reduces the number of causes that could cause a particular thing; is that correct?

"A. Correct.

"Q. So you're overall looking at a much bigger picture even though you have [a] small slice of it, right?

"A. Correct.

"Q. Now, once you made the determination that there was the hemorrhage, were you able to—what did you do with that information? Did you talk to another doctor or—

"A. No, I don't recall talking to another doctor. Most of the communications at the level that I'm at, is essentially a consultant, is communicated through the chart and notation. So I made my notation that there is bilateral hemorrhage and accompanied with the fact there is intracranial hemorrhage, the diagnos[is] of shaken baby syndrome should be considered highly.

"[Defense counsel]: Objection. Speculation. Lacks foundation. Move to strike.

"The Court: Well, I believe that he has just—that that's one thing to be considered, and if that's his opinion I don't see a basis for striking it. He's not saying that's it. Just it's something to consider.

"[The prosecutor]: Thank you doctor, nothing further."

Hernandez contends Dr. Tayani was not qualified to testify that "the diagnos[is] of shaken baby syndrome should be considered highly." Hernandez does not

7

challenge Dr. Tayani's qualifications to diagnose bilateral eye hemorrhages. Dr. Tayani never testified D.'s injuries were *because of* shaken baby syndrome or even that it was the likely diagnosis. He testified that given his observation D. had suffered bilateral eye hermorrhages, combined with his understanding she had also suffered an intracranial hemorrhage, shaken baby syndrome was something to be "considered highly." Although Dr. Tayani's primary area of expertise is ophthalmoplasty reconstructive surgery, there is no question that, given his background, he was amply qualified to testify about eye injuries and their possible causes. The trial court did not abuse its discretion by admitting Dr. Tayani's expert testimony.

C.

*Dr. Lempert was qualified to testify that D.'s injuries were a*
*"classic kind of thing for child abuse" and consistent with*
*shaken baby syndrome.*

Dr. Lempert testified about his qualifications as follows. He graduated from medical school, and he is the chief of radiology, chief of stroke treatment, and chief of interventional radiology at Mission Hospital, Mission Viejo. His specialized training included completing a residency in diagnostic radiology and fellowships in diagnostic neuroradiology, interventional neuroradiology, and interventional radiology. He studied under Dr. Jim Barkovich, the recognized world expert in pediatric neuroradiology. Dr. Lempert was also a professor at the University of California, San Francisco.

At trial, the prosecutor asked Dr. Lempert to give an example of what might cause the type of brain hemorrhages and stroke that D. suffered, based on the results of her MRI and CAT scan. The following colloquy ensued:

"[Dr. Lempert:] A. Oh, sure. I mean, you know—I mean, having, you know, 20 plus years of experience in this area and doing pediatric neuro and writing textbooks. I mean, this would be a classic kind of thing for child abuse.

8

"[Defense counsel]: Objection. Lacks foundation. Speculation.

"The Court: Well, I don't think it's speculation. He's just saying his experience is one source, right? So far overruled.

"[Dr. Lempert]: Let me amplify what I'm saying, okay? Very typically, you know, in our textbook type cases, you know, there are complex injuries. In so-called, quote, unquote, 'shaken baby syndrome' sometimes you get a combination of physical trauma and strangulation. And so you can have a child that's got their head hit against a wall or a floor and so you get the blood, right? You get the trauma.

"But then you get strangulation which then deprives the brain of oxygen so you get two different kinds of injury. You get the strangulation injury which produces stroke on an M.R.I. and you get the physical, shaken trauma that produces the blood. So, you know, it's pretty characteristic.

"I mean, you know, when you've done this for 20 years, these kind of things, it's not a mystery. You know, you don't get these types of patterns so to speak. They are, like, you know, very distinct patterns that you see."

Hernandez argues Dr. Lempert was not qualified to testify about shaken baby syndrome. Dr. Lempert did not offer an expert opinion as to the cause of D.'s injuries. His testimony was that her injuries, based on her MRI and CAT scan results, were, in his experience, consistent with injuries caused by child abuse and shaken baby syndrome.

Hernandez asserts Dr. Lempert did not have D.'s medical history or workup when evaluating her MRI and CAT scan results. Dr. Lempert testified, however, that working "in the dark," which he said means reviewing images without the influence of additional background of the patient's case, is a standard practice for radiologists to increase their objectivity in reviewing images. The trial court did not abuse its discretion by admitting Dr. Lempert's expert testimony.

9

## D.

*Dr. Kwon was qualified to state his opinion that D.'s injuries were due to "non-accidental trauma" and were consistent with "acceleration or deceleration" injuries.*

Dr. Kwon testified about his qualifications. He has a medical degree and completed residency programs in both pediatrics and emergency medicine. He has practiced medicine over 12 years, and written textbook chapters related to child abuse. He was also the director of the Suspected Child Abuse and Neglect Team at the University of California, Irvine Medical Center, and has spoken locally and internationally on child abuse issues.

Dr. Kwon testified that he had treated D. in the emergency room. The prosecutor asked Dr. Kwon about his medical opinion as to the cause of D.'s injuries. He testified as follows:

"[Dr. Kwon]: The medical opinion, my medical opinion was non-accidental trauma.

"By [the prosecutor]: Q. What does that mean[] in terms of non-accidental trauma?

"A. It's kind of hard—it seems to be relatively self-explanatory, I think. Just means that something that wouldn't happen by normal conventional play activity or household incidence.

"Q. Now, you've mentioned the children that come into the emergency room that you've cared for, you mentioned over the course of a year about 60,000, about a third of that, 20,000, are children meaning 18 and below. This child being in the 13-month category, what percentage number of children do you see or that the hospital sees that would fall into the 2-year age of 2 years and below category?

"A. If I were to approximate—that I personally saw or the hospital sees?

10

"Q. We'll go with whichever you're comfortable providing.

"A. I would say that every shift I see three to five patients that are under two.

"Q. All right. And oftentimes are these situations where the child[ren] have been hurt during the course of play or is it something where they're just [sick] because of some type of infection or whatnot?

"A. The most common thing that I see in the emergency department in this age is related to trauma.

"Q. And over the course of your career roughly how many children have you seen that fall into this category of children with a traumatic injury of some sort, two years of age and under?

"A. Thousands, I would say.

"Q. Okay. And so this is based on your wealth of experience as well in determining that this would, based on your training, experience, and what you've seen, be a child that falls into a situation where it's non-accidental as opposed to accidental [in]jury?

"A. What's the percentage?

"Q. No. I'm simply saying—let me ask this again. So you're forming a medical opinion based on that experience of seeing all these children and taking into account what you've seen, traumatic injuries to children in this age group of two years and younger; is that correct?

"A. Yes.

"Q. No further questions."

As one of D.'s treating physicians, and in light of his extensive training and experience in both emergency medicine and pediatrics as discussed *ante*, Dr. Kwon was well qualified to offer his above quoted opinion that D.'s injuries were caused by "non-accidental trauma." For the same reasons, Dr. Kwon was also qualified to testify

11

D.'s injuries were similar to "acceleration or deceleration injuries." Dr. Kwon testified D.'s injuries were consistent with the injuries of children whom he has seen following car accidents. Dr. Kwon's expert testimony was therefore properly admitted.

## II.

### WE REMAND FOR RESENTENCING BECAUSE THE TRIAL COURT FAILED TO STATE ITS REASONS FOR IMPOSING THE UPPER TERM ON COUNT 1.

The trial court imposed the upper term sentence of six years on count 1. Hernandez argues he should be resentenced because the trial court failed to state its reasons for selecting the upper term in imposing sentence on count 1, as required by Penal Code section 1170, subdivision (b), and California Rules of Court, rule 4.420(e). Penal Code section 1170, subdivision (b) provides in part that the trial court "shall set forth on the record the reasons for imposing the term selected." Similarly, rule 4.420(e) of the California Rules of Court requires that "[t]he reasons for selecting one of the three authorized prison terms referred to in section 1170(b) must be stated orally on the record."

At the sentencing hearing, after the trial court denied the motion for a new trial, Hernandez's counsel, the prosecutor, and the court discussed whether Hernandez should be placed on probation. The prosecutor argued probation was inappropriate because this was a "case where [Hernandez] should receive the maximum possible sentence." The trial court stated, "I think we have agreed that he was in a position of trust and he was the babysitter at this time. Anyway, what was defense counsel's side about that?"

Hernandez's counsel asked the court to find Hernandez eligible for probation because of his lack of a criminal history and because this was a single incident; in addition, he stated, "a number of complications in the field and at the hospital . . . exacerbated the child's injuries." The court stated, "[g]reat bodily injury was certainly

12

one of the problems."  In response to Hernandez's counsel's argument, the prosecutor argued the original trauma led to D.'s additional complications.

During the trial court's final remarks about probation, the court stated, "[a]ll right.  And further the problem was exacerbated by it not getting immediate 911 medical attention.  We'll never know what the difference might have been in terms of treatment had that not happened.  [¶] At any rate, there would have to be one straight finding [of] great bodily injury.  I agree with that finding.  And that doesn't seem to me to be probationable, even more so since the defendant's statements to the police were grudging and then not—to say the least, not greatly trustworthy.  It was certainly self-serving, but it really didn't help a great deal.  [¶] So, at any rate, the probation will be denied.  This will be a question of what the sentence should be.  [¶] Anything else?"

Hernandez's counsel stated that this case does not warrant the maximum sentence because Hernandez did not have a criminal record and this was his first felony conviction.  The prosecutor submitted and did not make any additional comments.

Following counsel's arguments, the trial court, without comment, imposed Hernandez's sentence stating, "[o]n count 1, 273a, sub (a), and defendant will be sentenced to six years [in] state prison.  And then on the great bodily injury [(GBI)] allegation sentenced to six years consecutive to that, making it a total of 12.  [¶] And on count 2, the 273d, sub (a) and the same GBI allegation sentence on count 2 of the GBI. Second GBI allegation will be suspended with the instruction to become permanent per 654 on completion of the sentence on count 1.  [¶] And as far as did we have a correct total of how many days should be granted?  It says his days in custody, 28, on page one of the probation report.  [¶] Does anybody have any argument with that?"  After the court confirmed the correct number of credits with counsel, the hearing ended.

The trial court did not orally state its reasons for imposing the upper term on count 1 and did not refer to any reasons it had cited for denying probation when the court imposed Hernandez's sentence.  We cannot presume the trial court imposed the

13

upper term based on the same reasons it denied probation. One of the factors cited by the court in denying probation was that D. suffered great bodily injury. That factor could not have been relied upon by the court in imposing the upper term because Hernandez was sentenced for the great bodily injury enhancement which was exclusively based on that same factor. Penal Code section 1170, subdivision (b) states in part, "the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." California Rules of Court, rule 4.420(c) also states in part, "a fact charged and found as an enhancement may be used as a reason for imposing the upper term only if the court has discretion to strike the punishment for the enhancement and does so." The court thus could not rely on the great bodily injury D. suffered to both enhance Hernandez's sentence as to count 1 and impose the upper term on count 1.

The Attorney General contends Hernandez has forfeited his argument the trial court erred by failing to state its reasons for imposing the upper term on count 1. If a defendant failed to object to a trial court's failure to state its reasons, then the defendant has waived his or her right to challenge the sentence on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 352-353.) In order for waiver to occur, however, the trial court must have given the defendant a "meaningful opportunity to object" to the sentence. (*Id.* at p. 356.) The Supreme Court has stated the trial court must "clearly give[] the parties a meaningful opportunity to object" by stating that after it announced the proposed sentence with its reasons, the parties would be permitted to object to, or seek clarification of, the sentence itself or the court's reasons for imposing it. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 755.)

Although Hernandez's counsel had opportunities to argue at the sentencing hearing about Hernandez's eligibility for probation and possible sentence, no meaningful opportunity was given to counsel to object to, or seek clarification of, the trial court's pronouncement of sentence. The court solicited counsel's comments regarding

14

Hernandez's credits, but it did not invite comments from counsel as to the upper term sentence on count 1. Thus, because the trial court did not demonstrate its "willingness to consider" objections to the sentence, Hernandez did not waive his right to challenge the trial court's error. (*People v. Gonzalez*, *supra*, 31 Cal.4th at p. 752.)

### DISPOSITION

The judgment is affirmed and the matter is remanded for resentencing with directions that the trial court select a term on count 1 and state its reasons for selecting that term.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.